**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

Civil Action No. _____

BLAISE CHIVERS-KING;
DYLAN TOLAR, by and through Debra Dever;
CHARLES "REES" KARN

       Plaintiffs,

v.

WYOMING DEPARTMENT OF FAMILY SERVICES;
WYOMING BOYS' SCHOOL;
DALE WEBER, in his individual and official capacity;
ELSA OLSON, in her individual capacity;
AMANDA TURNER, in her individual capacity
TATE ADAMS, in his individual capacity;
MIKE NELSON, in his individual capacity;
MARK NELSON, in his individual capacity;
THAD SHAFFER, in his individual capacity;
JOHN SCHWALBE, in his individual capacity;
KEVIN MCGENTY, in his individual capacity; and
MARGARET DAHLKE, in her individual capacity

       Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiffs, by and through their attorneys Allison Mahoney of ALM Law, LLC and Qusair Mohamedbhai, Ciara Anderson, and Matthew Cron of Rathod | Mohamedbhai LLC, allege as follows:

**<u>INTRODUCTION</u>**

1.    This action arises out of the unconstitutional and unlawful practices at the Wyoming Boys' School (the "Boys' School") in Worland, Wyoming with respect to three former

residents: Charles Rees Karn ("Rees"), Blaise Chivers-King ("Blaise"), and Dylan Tolar ("Dylan") (collectively "Plaintiffs").

2.      The Boys' School is a state-run correctional facility governed by the Wyoming Department of Family Services ("DFS"). Wyoming DFS certifies approved placements, such as at the Boys' School, as safe and appropriate placements for children. As a result, the Boys' School houses male minors between the ages of twelve and twenty-one who have complex needs. Minors are sent to the Boys' School after they have been adjudicated "juvenile delinquents" by Wyoming courts and placed in the State's custody. The majority of the Boys' School's residents suffer from some form of mental illness for which there is a compelling need for treatment. In many cases, such as with Plaintiffs, the minor's mental illnesses are severe and their mental health needs are highly complex. Many residents have also suffered from significant trauma, contributing to their need for therapeutic services.

3.      The Boys' School touts itself as a place where boys are provided "with opportunities to make changes to their lives . . ." and it claims to use evidence-based interventions, such as a program entitled "Balanced and Restorative Justice," to address the types of behavioral issues common to residents at the Boys' School. Nothing could be further from the truth.

4.      As detailed herein, the Boys' School staff unlawfully subjected Plaintiffs to solitary confinement and mechanical restraints as physical punishment for minor infractions that were a function of Plaintiffs' known mental illnesses; discrimination against the boys based on their disabilities; systemic and constant physical and emotional abuse; denial of necessary medical and therapeutic care; and denial of a proper education.

5.     The Defendants caused the Plaintiffs to suffer significant harm. As a result, the Plaintiffs left the Boys' School more damaged and traumatized than when they first entered the facility.

## JURISDICTION AND VENUE

6.     This action arises under the Constitution and the laws of the United States and is brought pursuant to the Fourteenth and Eighth Amendments of the U.S. Constitution. This action is also brought pursuant to the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (Section 504), 42 U.S.C. § 12101, et seq.

7.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

8.     This Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

9.     Venue is proper in the District of Wyoming under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions that gave rise to Plaintiffs' claims occurred in this District.

## PARTIES

I.     **Plaintiffs**

10.     Plaintiff Charles "Rees" Karn is from Cheyenne, Wyoming and suffers multiple disabilities. Reese was held at the Boys' School on two separate occasions: (1) between 2017 and October 2019, when he was thirteen to fifteen years old; and (2) between November 2019 and May 2021, when he was fifteen to seventeen years old. During his time at the Boys' School, staff subjected Rees to extreme and protracted solitary confinement, including stints of thirty days and forty-five days at a time; excessive force, including one instance in which Rees suffered a broken his wrist; improper and painful restraints; deprivation of meaningful human contact and

associations; and psychological abuse. Rees never received any procedural due process protections prior to his placements in solitary confinement, nor did he receive any periodic review of his classification. The Boys' School also discriminated and excluded Rees from programming, including educational opportunities and therapy services, on the basis of his mental health disabilities.

11.     Plaintiff Blaise Chivers-King is from Sheridan, Wyoming and suffers from multiple disabilities. Blaise was held at Wyoming Boys' School on two separate occasions: (1) between April 2020 and March 2021 when he was fifteen years old; and (2) between May 2021 and May 2022 when he was sixteen years old. During his incarceration at the Boys' School, staff subjected Blaise to significant punishment, including solitary confinement, improper and painful restraints, deprivation of meaningful human contact and association, excessive force, deprivation of medication, and ruthless psychological abuse. Blaise was placed in solitary confinement on twenty (20) separate occasions, and his time in solitary confinement ranged from days to weeks. Blaise never received any procedural due process protections prior to his placements in solitary confinement, nor did he receive any periodic review of his classification. the Boys' School also discriminated and excluded Blaise from programming, including educational opportunities, on the basis of his mental health disabilities.

12.     Plaintiff Dylan Tolar appears by and through his mother, Debra Dever, who is his guardian and conservator. Dylan has lived in Wyoming his entire life and was held at Wyoming Boys' School from June 2020 through February 2021. Dylan has a number of mental health diagnoses and disabilities, including cerebral palsy, bipolar disorder, ADHD, epilepsy, executive function disorder, and autism spectrum disorder. At the Wyoming Boys' School, Dylan experienced discrimination based on his disabilities, including being locked alone in his room for

hours on end; emotional and psychological abuse; and denial of necessary medical care. Dylan also experienced solitary confinement, as staff would lock him alone in his room for hours, only allowing him to leave his room to use the restroom. Dylan experienced seizures when he was young but had not had a seizure for approximately twelve years prior to going to the Boys' School. Despite this, Dylan began experiencing grand mal seizures due to the stress the staff inflicted on him. The Boys' School also discriminated and excluded Dylan from programming, including educational opportunities, on the basis of his mental health and physical disabilities.

## II.   **Defendants**

13.     Defendant Wyoming Boys' School is a state correctional facility for minors in Worland, Wyoming. Defendant Boys' School is a public entity within the meaning of the Americans with Disabilities Act (ADA). *See* 42 U.S.C. § 12131(1).

14.     Defendant Wyoming Department of Family Services ("DFS") is a public entity that governs the Wyoming Boys' School pursuant to Wyo. Stat. §§ 9-2-2006 and 2104. Defendant DFS receives federal funding. Defendant DFS approves and certifies placements, such as the Boys' School, as safe and appropriate placements for children. Defendant Wyoming DFS is charged with developing and overseeing an array of services, programs, and placements for vulnerable children, including Wyoming's juvenile services, juvenile probation, and child protective services. Juvenile services include court-ordered "youth treatment facilities," whose primary purpose, along with all other out-of-home placements for children in Wyoming, is to "provide for the treatment needs of [children], which could not be addressed in the community." Wyo. Dept. of Fam. Servs., *Juvenile Services*, https://dfs.wyo.gov/services/juvenile-services/ (last visited Aug. 21, 2023). DFS specifically oversees the Boys' School. In addition to its oversight responsibilities, Defendant DFS also approves, monitors, and investigates allegations of abuse or misconduct at facilities and

service providers for youth who require out-of-home care, including the Boys' School. In turn, those DFS-approved facilities receive funding for residential and treatment services for children.

15.    Defendant Dale Weber is the current Superintendent of Wyoming Boys' School. At all relevant times, Defendant Weber was the Duty Superintendent of Wyoming Boys' School. As the Duty Superintendent, Defendant Weber was responsible for the custody and control of the minors confined at the Boys' School. Defendant Weber was a final decision maker with respect to Plaintiffs treatment while at the Boys' School.

16.    At all relevant times, Defendant Elsa Olson was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in her capacity as a dorm director in Dorm 4 at Wyoming Boys School. Today, Defendant Olson is the Prison Rape Elimination Act ("PREA") Compliance Manager at the Boys' School.

17.    At all relevant times, Defendant Tate Adams was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in his capacity as a dorm director in Dorm 3 at Wyoming Boys' School.

18.    At all relevant times, Defendant Amanda Turner was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in her capacity as a dorm director at Wyoming Boys' School.

19.    At all relevant times, Defendant Thad Shaffer was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in his capacity as security guard at Wyoming Boys' School.

20.    At all relevant times, Defendant John Schwalbe was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in his capacity as a dorm 4 staff member at Wyoming Boys' School.

21.     At all relevant times, Defendant Mike Nelson was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in his capacity as an employee at Wyoming Boys' School. Mike Nelson was a Dorm 1 supervisor and became the Dorm 4 director after Defendant Elsa Olson transferred to an administrative role.

22.     At all relevant times, Defendant Mark Nelson was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in his capacity as a security guard at Wyoming Boys' School.

23.     At all relevant times, Defendant Kevin McGenty was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in his capacity as a Dorm 2 staff member at the Wyoming Boys' School.

24.     At all relevant times, Defendant Margaret Dahlke was a citizen of the United States, a resident of Wyoming, and was acting under color of state law in her capacity as a nurse at Wyoming Boys' School.

## FACTUAL ALLEGATIONS

25.     The Wyoming Boys' School is a state-run correctional facility for minors with complex needs between twelve and twenty-one years old. The facility consists of four dorms on a forty-acre plot of land in Worland, Wyoming. The facility also has two on-campus residences for the Superintendent and Deputy Superintendent to ensure senior administrative staff are always present on campus.

26.     The Boys' School is a placement of last resort for youth and is supposed to provide for boys' treatment, which could not be safely addressed in their communities.

27.     Wyoming law provides that the Boys' School is intended to be reformatory and rehabilitate the youth housed at the facility. *See* Wyo. Stat. § 25-3-105.

28.     Minors at the Boys' School have complex needs and many suffer from mental health disabilities for which they require mental health treatment.

29.     Minors at the Boys' School are diagnosed with, among other things, post-traumatic stress disorder ("PTSD"), ADHD, mood disorders, substance abuse, and other significant mental health impairments, as well as symptoms of bipolar disorder, psychotic disorder, and depression.

30.     The Boys' School touts itself as a place where staff "provide supportive services focusing on psychological/emotional stability, educational and physical development, and mental health therapies. Programs are specifically designed for youth to learn socially responsible values and life skills, restructure their critical thinking and prepare for a successful transition back to their families and communities."

31.     The Boys' School falls woefully short of these espoused commitments, and the minors who are housed there do not receive the rehabilitative and restorative treatments that the Boys' School promises.

32.     Instead, leadership and staff at the Boys' School regularly subject minors to cruel and harsh punishments, such as prolonged solitary confinement; improper use of restraints; discrimination; verbal, emotional, and physical abuse; denial of necessary medical and therapeutic care; and denial of a proper education.

33.     In 2020 and 2021, the abuses perpetrated by the Boys' School's staff dramatically increased. The toxic and abusive culture rippled down from leadership to the dorm directors and other staff. Defendants Elsa Olson, Tate Adams, Kevin McGenty, Margaret Dahlke, Mark Nelson, Mike Nelson, Thad Shaffer, and John Schwalbe all participated in unconscionable abuse toward boys at the Boys' School.

34.     What's worse, the Boys' School's Superintendent and Deputy Superintendent are required to sign off on the use and continuation of solitary confinement. Former superintendent Gary Gilmore was widely believed to have had significant alcohol abuse issues, including working while drunk. Defendant Dale Weber, who is currently the Superintendent and served as the Deputy Superintendent between 2012 and 2022, also did nothing to prevent the use of restraints or abuse, despite having the authority to do so.

35.     The widespread abuses at the Boys' School attracted the attention of local media outlets. In November 2022, following nearly a year of investigation, reporters publicized that violence, reliance on physical restraints, and the use of solitary confinement had become increasingly common in recent years at the Wyoming Boys' School. *See* Tennessee Watson & Victoria Eavis, *Violence, restraints, isolation increase at Wyoming Boys' School*, WYOFILE, (Nov. 11, 2022), https://wyofile.com/violence-restraints-isolation-increase-at-wyoming-boys-school/.

## I.     Solitary Confinement at Wyoming Boys' School

36.     While there is no universal definition of solitary confinement—a term that is often given other labels such as "segregation" or "isolation"—the National Commission on Correctional Health Care defines it as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals." NAT. COMMISSION OF CORRECTIONAL HEALTH CARE, *Solitary Confinement (Isolation) (2016)*, https://www.ncchc.org/position-statements/solitary-confinement-isolation-2016/.

37.     The Boys' School uses various terms to describe its practice of solitary confinement, such as "detention status" "out of community status," "seclusion," or "observation status."

38.     Solitary confinement at the Boys' School not only occurred in designated isolation rooms, but also in rooms where boys were locked alone in their room.

39.     Whichever term the Boys' School intermittently uses to describe its practice, and no matter which room a boy is sent to, it all amounts to solitary confinement: 23 hours a day of isolation with no meaningful social interaction, environmental stimulation, or human contact.

40.     The Boys' School relied heavily on the use of solitary confinement, often for prolonged periods of time, when Plaintiffs were placed at the Boys' School.

41.     Indeed, minors sent to solitary confinement for over seventy-two (72) hours dramatically increased in 2020 and 2021. For example, in 2018, approximately five children were placed in solitary confinement for over 72 hours. By 2020 that number rose to over 10 children, and by 2021 it reached approximately 15 children.



42.     The detention rooms in the Boys' School are small, stark, and devoid of any stimulation. A typical room is approximately 8' x 10' and contains a steel toilet and thin mattress on the floor (which is often removed during the day). There is no furniture. The floor is concrete,

and the walls are made of cinderblock. There is only one window on the door, which is always covered by a magnet. The light in the room is also controlled on the outside of the room and a camera is in the room to monitor the kids, including when they use the toilet. The minors in solitary confinement do not have phones, radios, televisions, books, or any other property or form of entertainment.



*December 10, 2021 photograph of detention room in Wyoming Boys' School*

43.     Wyoming Boys' School policy gives staff wide discretion to decide whether residents should be placed on "detention status," or "out of community status," wherein boys are separated from the general population.

44.     For any alleged disruptive behavior, boys can be immediately put in a locked room and monitored and are typically only removed from the room they are locked in for one hour a day.

45.     Minors in solitary confinement at the Boys' School have virtually no meaningful human interaction and are only provided with the programs and educational services staff decide

they need; typically, this results in them not receiving any programs or services. The most any minor in solitary confinement receives is a packet of worksheets in their cell, which is no substitute for the classroom, and which is particularly inappropriate and damaging for juveniles with learning disabilities.

46.     The minors in solitary confinement are not allowed to speak to any of their peers. They are not allowed to call their loved ones because staff revoke their privileges, and they are not permitted to write or receive letters from their families. As for interactions with school staff, they are often limited, as the minors are largely monitored on video.

47.     The Boys' School claims that under its policy, solitary confinement (which it refers to as "seclusion") may only be used for residents who are deemed an immediate threat to themselves or others, and residents are in "seclusion" for **the least amount of time necessary**.

48.     In reality, minors in solitary confinement are locked in these bare rooms for **at least** twenty-four hours and sometimes for months on end with little to no out-of-cell time. While the Boys' School policy provides that each minor in solitary confinement shall receive "daily large-muscle exercise for a period of at least one (1) hour," the Boys' School frequently denies the minors this reprieve from solitary confinement.

49.     Moreover, Boys' School staff abuse boys while they are placed in solitary confinement, and Defendants in leadership positions or with oversight authority fail to intervene. The Boys' School's staff psychologically, emotionally, and physically abuse boys held in solitary confinement. They call them names, demean and taunt them, subject them to improper restraints, and assault them.

50.     Defendants treat youth in solitary confinement at the Boys' School inhumanely. There is no legitimate penological justification for the Boys' School's policy and practice of denying children access to basic human needs and harming them while in solitary confinement.

## II.     Defendants Were Aware of but Ignored the Fact That Children are More Vulnerable to the Harms of Solitary Confinement

51.     The harms born on people in solitary confinement are well-understood and recognized among mental health researchers, physicians, the human rights community, and corrections officials.

52.     There is broad international consensus as to the serious risks to ___any___ person's mental and physical health that solitary confinement poses, even for individuals who are otherwise healthy.

53.     Nationally, the American Public Health Association, National Academy of Sciences, Commission on Safety and Abuse in America's Prisons, American Psychological Association, and a number of correctional officials have issued statements about the harmful effects of prolonged deprivation of social contact and environmental stimulation in solitary confinement.

54.     Solitary confinement triggers traumatic psychological harms, such as detectable changes in neural pathways and the morphology and neurochemistry of the brain. These changes can be accurately characterized as a physical injury or illness because they adversely affect the nature and functioning of the sufferer's brain.

55.     Solitary confinement is especially harmful for children, who are still developing physically, psychologically, and socially.

56.     Medical research on adolescent brains explains why juveniles are more vulnerable to the risk of long-term harm. In the adolescent brain, the connections between the frontal lobe and

the mid-brain have not fully developed. If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric conditions like paranoia and anxiety. Trauma from solitary confinement has a high likelihood of causing these permanent changes.

57.     As a result, children in isolation face a significant risk of serious mental harm. Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, hypervigilance, agitation, hallucinations, aggression, a sense of impending emotional breakdown, hypersensitivity, a general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. Indeed, research shows that almost all suicides within juvenile correctional facilities occur when the child is in some type of isolation.

58.     Solitary confinement can lead to chronic conditions like depression, which, in teenagers, can manifest as anger or as self-harm. In addition, children who experience depression and anxiety in their teenage years are at a higher risk of presenting with these diagnoses again. Children subjected to solitary confinement are also at an increased risk of suffering low self-esteem, vegetative features, withdrawal, and hopelessness associated with depression—all of which can become long-standing issues. Depression has a 10% to 15% mortality rate associated with it, and solitary confinement increases the risk of suicide substantially compared to the general population.

59.     Solitary confinement of adolescents can also lead to long-term trust issues with adults, including paranoia, anger, and hatred. Unlikely to trust others, children emerging from solitary have trouble forming the therapeutic relationships necessary to address the mental health concerns resulting from solitary confinement.

60.     Solitary confinement and restraints are not only harmful to minors, but also do not reduce future misbehavior. In fact, research has repeatedly revealed the opposite: placing children in solitary confinement can exacerbate agitation and the behaviors that led to discipline in the first place.

61.     For children with preexisting trauma, mental illnesses, or disabilities, the risk of harm from isolation is even greater. Their mental health issues or disabilities can worsen, resulting in long-term harm.

62.     There is a disproportionately high incidence of preexisting trauma and mental health concerns among juveniles in the court system. Research shows that over 60% of the youth in correctional settings have an underlying major mental illness. Stress from isolation can compound past trauma and exacerbate mental illnesses and disabilities.

63.     For children with mental illnesses or disabilities, the risk of harm is especially great. Youth with mental illnesses and disabilities already have cognitive deficits in their brain structure or biochemistry. They already have weakened defensive mechanisms, are at a higher risk for further mental health complications and are more susceptible to significant trauma from social isolation. Trauma from social isolation will be more long-lasting for those with mental illnesses or disabilities than for those without.

64.     The American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the National Commission on Correctional Health Care all have called on facilities to halt the use of solitary confinement of juveniles for disciplinary purposes, otherwise referred to as "disciplinary isolation." Facilities that have reduced their reliance on disciplinary isolation and instead adopted more appropriate techniques for managing juveniles have seen reductions in rates of violence and misbehavior. Most of these facilities allow for short-term

separation—measured in *hours*, not days, weeks, or months—as a last resort when other options fail to diffuse situations which pose an acute risk of harm to the juvenile or others.

65.     It is clear that putting children in solitary confinement poses a risk of serious and long-term psychological and physiological harm. The prevailing medical, scientific, professional, and correctional authorities demonstrate that it violates contemporary standards of decency in a civilized society to expose children in secure detention to such a risk.

66.     Defendants knew of the severe risks that even short periods of solitary confinement have on a child's mental health but chose to disregard those risks.

67.     The Boys' School staff not only continued to subject children, including Plaintiffs, to solitary confinement, they increased their reliance on solitary confinement and subjected children to solitary confinement in especially cruel and unusual ways and without access to basic human needs.

68.     Solitary confinement and restraints are not only harmful to minors, but also do not reduce future misbehavior. In fact, research has repeatedly revealed the opposite: placing children in solitary confinement exacerbates agitations and the behaviors that led to discipline in the first place.

69.     There is also no legitimate penological justification for the Boys' School's policy and practice of denying children access to basic human needs while in solitary confinement. The Boys' School inhumanely deprives children in solitary confinement of, *inter alia*, required daily educational instruction, outdoor recreation, reading and writing materials, a clean cell free from the smell or presence of human waste, and normal human interactions.

III.   **The Boys' School Subjects Minors to Physical Abuse and Improper Use of Restraints**

70.   Adding to the harm inflicted on boys who endure solitary confinement at the Boys' School is the physical abuse inflicted on them by the Boys' School staff.

71.   The Boys' School's policy allows any staff to initiate physical restraints, without any safeguards. Staff are authorized to physically restrain boys using their body to apply holds and/or use physical force. For instance, staff applied rotational pressure on minors' joints to restrain them, which caused the minors excruciating pain.

72.   Staff are also authorized by policy to use mechanical restraint devices to immobilize boys. Mechanical restraints include, but are not limited to, shackles, leg restraints, and the restraint chair.



*Restraints used by Wyoming Boys' School*



*Restraint Chair*

73.     Like reliance on solitary confinement, the Boys' School staffs' reliance on restraints also increased dramatically while Plaintiffs were at the Boys' School. From 2018 to 2019, the number of mechanical restraints more than doubled, from fewer than twenty to nearly forty instances. From there, instances of restraints climbed all the way to 58 in 2021.



74.     Use of a restraint chair also steadily increased from one use in 2018, to five uses in 2019, eight in 2020, and thirteen in 2021.

75.     The Boys' School staff also subjected children in solitary confinement to improper restraints, including tackling children to the ground and strapping them to a restraint chair inside the cell for hours on end. The psychological toll such extreme and cruel behaviors take on these vulnerable minors is significant.

76.     Indicative of the increasingly chaotic and abusive situation unfolding inside the Boys' School, in 2020 and 2021, calls to the Washakie County Sheriff's Office from the Boys' School reached an all-time high.

77.     On one occasion, staff responded to a child hanging a bed sheet around his neck by charging into his room and punching him. Defendant Mark Nelson punched the resident in the

face, and the boy bit him in response. Another staff member then slapped this boy in the face. This minor was then restrained and locked in his cell for approximately four hours. The child suffered bruising to both sides of his face and severe headaches. The sheriff deputy investigating the incident noted that, although not part of the investigation, there appeared to be a lack in training and/or policy restrictions that may have contributed to the injuries.

78.     In 2021, one staff member reported that the Boys' School staff had not been trained on the True Thought cognitive behavioral therapy training in at least eight years. This staff member also reported that there is a great deal of confusion about training and that many new staff members are taking jobs at the Boys' School with little-to-no experience of working with children.

79.     The lack of training, in part, led to an unconstitutional policy, pattern, and practice of the punitive and inhumane use of isolation and restraints.

## IV.    Defendants' Policies and Practices discriminate against Children with Disabilities

80.     The Boys' School's policies, procedures, and customs regarding solitary confinement ensure that juveniles with disabilities are housed in a manner that exacerbates their conditions.

81.     Instead of housing juveniles in settings where they can receive treatment and services that they need to live safely and with others, the Boys' School subjected children with psychiatric and developmental disabilities, including Plaintiffs, to solitary confinement when they engage in nonconforming behaviors due to their disabilities. For example, children diagnosed with ADHD, including Plaintiffs, may exhibit impulsive behavior such as fighting with peers or being unable to focus on or be attentive to staff directions. Rather than developing a system with reasonable accommodations that positively reinforces preferred behaviors or uses mental health services to intervene, re-direct, and de-escalate situations, the Boys' School harshly punishes these children, including Plaintiffs, with solitary confinement and unreasonable physical restraints.

82.     The Boys' School fails to reasonably modify its solitary confinement policies and procedures to ensure that children with disabilities are not unnecessarily placed in solitary confinement, or have their time in solitary confinement extended, because of their disabilities. For example, children with psychiatric or developmental disabilities have difficulty regulating their behaviors and may respond erratically or inappropriately to conflict, stress, trauma, staff, and other youth. For example, Plaintiffs, because of their disabilities, do not have effective coping skills to manage the conditions and conflicts inherent in the Boys' School and often react to stressful situations inside the facility with emotional outbursts and impulsive behaviors. Some children, like Plaintiffs, also have a hard time understanding facility rules or directions. The Boys' School fails to identify or recognize behavior as disability related and fails to provide reasonable accommodations, supports and services that these minors need. Instead, the Boys' School responds by labeling their actions as misbehavior and sends minors, including Plaintiffs, to, or extends their time in, solitary confinement.

83.     The Boys' School also fails to modify its policies and procedures while minors with disabilities are in solitary confinement. This includes failing to offer adequate out-of-cell time, social interaction, familial interaction, environmental stimulation, mental health treatment, recreation, and school services to prevent their mental health symptoms from worsening. As a result, many minors with psychiatric and developmental disabilities in isolation experience further harm and engage in self-harm such as banging or punching the doors or concrete walls or, in the case of Plaintiffs, attempting suicide.

84.     The unnecessary placement of minors with disabilities in solitary confinement and excessive punishment perpetuates unwarranted assumptions and stereotypes that they are incapable of participating in and benefiting from services, activities, and programs offered to other

residents at the Boys' School. Such placement also causes harm by severely limiting their independence and daily activities, including social contacts, educational advancement, and healthcare.

**V.   Defendants' Reliance on Solitary Confinement, Use of Restraints, and Discrimination Based on Minor's Disabilities Seriously Harmed Plaintiffs and Exposed Them to a Substantial Risk of Serious Harm**

### a.   *Plaintiff Charles Rees Karn*

85.   Plaintiff Rees Karn was born and raised in Cheyenne, Wyoming. He is the youngest son born to his mother and has a loving relationship with her and his older brother. He enjoys music, art, and history.

86.   Rees was abused as a child and was in Wyoming DFS custody for the majority of his childhood.

87.   Rees has been diagnosed with depression, Attention ADHD, ODD, Impulse Control Disorder, and Conduct Disorder.

88.   Rees' mental health disabilities substantially limit one or more major life activities, including but not limited to mentally processing current events, thinking, learning, concentrating, comprehending, interacting with others, sleeping, and effectively coping with anxiety and stress.

89.   Rees's disabilities were recorded, and he was regarded as having such impairment by the Boys' School and its staff, as well as by Wyoming DFS and its staff.

90.   Rees was first held at the Boys' School beginning his eighth-grade year. He was held there for two years.

91.   In 2020, when Rees was sixteen years old, Rees was released from the Boys' School to his family. While he was home, a licensed psychologist evaluated Rees and confirmed his chronic history of ADHD, ODD, and Conduct Disorder. He classified Rees as "Undersocialized,

Active." Rees' functional testing fell in the very low range compared to other children his age. It was documented that Rees suffered from significant anxiety and depression, manifested by feelings of frustration and hopelessness. The evaluating psychologist provided the following recommendations for Rees' treatment:

      a.   Consistent and predictable guidelines and routines are required;

      b.   Moments of upheaval need to be dealt with matter-of-factly and quickly;

      c.   Limits should not be imposed with "hostility or rejection."

      d.   Counselors should assume a stance which is benign, but authoritarian. They must apply limits in a supportive rather than punitive matter. Patience is an essential quality since it will be necessary to repeat instructions and explanations;

      e.   Staff should be honest and supportive, but also decisive. They should be quick to reward any tentative attempts at self-control or self-responsibility;

      f.   Praise and recognition should be offered at every opportunity, no matter how insignificant the positive behavior may seem.

92.     In May 2020, shortly after his 2020 evaluation, Rees returned to the Boys' School.

93.     When he returned, Boys' School staff were informed of Rees' disabilities and recommended treatments but failed to implement any of the recommendations.

94.     For example, rather than creating consistent and predictable routine, staff transferred Rees between dormitories as a form of punishment. Before Dorm 2 was shut down due to budget cuts, Gary Gilmore and Defendant Weber transferred Rees from Dorm 4 to Dorm 2 to punish him. However, when Gilmore and Weber realized that Rees was doing well in Dorm 2, and it was not punishing him as they intended, he was transferred back to Dorm 4. In so doing, Defendant Weber intentionally deprived Rees of the opportunity to successfully rehabilitate.

95.     Instead of treating Rees for behaviors that Defendants knew were manifestations of his disabilities, the Boys' School staff targeted Rees and regularly provoked and triggered him to react by threatening and taunting him.

96.     Defendant Shaffer, along with other staff members, routinely made statements that they knew upset Rees, such as "oh you like being touched by grown men," in order to provoke him and restrain him.

97.     The Boys' School also held Rees in solitary confinement on approximately thirty separate occasions, including one stay that spanned thirty days and another that spanned forty-five days.

98.     Prior to his second stay in the Boys' School, Rees had never been locked in a room for more than two hours.

99.     During his second stay, Defendants Tate Adams (while Rees was in Dorm 3) and Elsa Olson (while Rees was in Dorm 4) subjected Rees to prolonged periods of solitary confinement.

100.    Defendant Weber approved Rees' confinement while he was in Dorms 3 and 4.

101.    In confinement, Rees experienced total isolation. He spent 24 hours per day alone until one staff member eventually spoke up to say that he needed to be let out for at least one hour a day for exercise. Even on the occasions that he was allowed to go to recreation, he was not permitted any meaningful human interactions.

102.    While in solitary confinement in Dorm 4, Defendant Elsa Olson did not allow therapy providers or teachers to speak to Rees.

103.    While in solitary confinement in Dorm 3, Defendant Tate Adams refused to provide Rees therapy and education services.

104.    Rees' confinement was not limited to detention status in the dorms populated with other minors. The Boys' School further isolated Rees in Dorm 2, which had shut down following budget cuts.

105.    While in Dorm 2, Rees experienced compounding isolation locked in a dormitory room in the empty dorm.

106.    During an approximately thirty-day stay in Dorm 2, Rees' only interactions were with the staff member assigned to watch him.

107.    While isolated in Dorm 2, Defendant Weber was directly responsible for Rees' care and treatment.

108.    Rees felt overwhelmingly frustrated and angry about his placement in solitary confinement, exacerbating the symptoms of his disabilities.

109.    Exhibiting sadistic levels of cruelty, Boys' School staff, including Defendants Weber, Shaffer, Schwalbe, and Mark Nelson made Rees' prolonged isolation even more severe by physically restraining him in a restraint chair inside the cell. In the restraint chair, Rees' wrists, ankles, and mid-section were strapped down so that he could not move--**for up to twelve hours a day**.

110.    For approximately two weeks while he was isolated in Dorm 2, Rees was restrained in the restraint chair every day for up to twelve hours a day.

111.    During this time, Rees lost significant weight because Boys' School staff, including Weber, starved him.

112.    Rees became so distressed in the restraint chair that he hyperventilated, and although nursing staff sometimes checked his vitals while he was restrained, no one let him out of the chair.

113.    While Rees' was restrained, the staff assigned to watch him refused to speak to him, further isolating and traumatizing him.

114.    During a forty-five-day stay in solitary confinement, Rees reached a point in which he began breaking lightbulbs in the detention room and destroying property. Staff—including Thad Shaffer, John Schwalbe, Chisum Bennett, Aaron Tadlock, and Beau Byrd—entered the detention room with riot gear and tackled Rees to the ground.

115.    Defendant John Schwalbe forcefully shoved Rees' face into the glass. While holding Rees' face in the shattered glass, Schwalbe told him, "you want to break shit at our facility, this is what you are going to get."

116.    Defendant Thad Shaffer broke Rees' wrist.

117.    After this incident, Rees' arm became bruised and swollen, and he complained to the staff and nurse that his arm was broken.

118.    The Boys' School staff, including Defendant Weber, refused to seek medical treatment for Rees, claiming that he was too aggressive. Staff gave him only an ace bandage and over-the-counter pain relief for his broken arm.

119.    Rees was not seen by a doctor until a whistleblower raised concerns with the Department of Family Services. The doctor quickly determined that Rees' wrist was broken through a brief physical examination.

120.    Even after the staff broke Rees' wrist, they continued to physically restrain him in the restraint chair.

121.    Rees's despair in solitary confinement continued to escalate until he attempted to hang himself. Although he never had suicidal ideations before his second stay at the Boys' School, being alone all day in solitary confinement drove him to the point that he wanted to die.

122.    The Boys' School staff severely downplayed Rees' attempted suicide and treated it as attention seeking behavior.

123.    Defendant Kevin McGenty was the first person to respond to Rees' attempted suicide. Rather than immediately attempt to save Rees, McGenty stood at the door and watched Rees hanging from the fire suppression system until Rees lost consciousness.

124.    Following his attempted suicide, Rees did not receive any therapy at the Boys' School and remained in solitary confinement.

125.    One DFS employee became so concerned about Rees' safety at the Boys' School that she scheduled a psychological evaluation to determine Rees' needs. During the evaluation, the DFS employee indicated that there had been communication challenges with the Boys' School that made it difficult for her to get a full picture of the support that has been offered and the barriers to progress.

126.    During his various periods of solitary confinement, Rees did not have meaningful access to or ability to participate in any therapeutic programming or education classes.

127.    During his various periods of solitary confinement, Rees did not receive any mental health services whatsoever.

128.    At no point during his time at the Boys' School did Rees receive any notice, hearing, or any form of due process prior to placement in solitary confinement.

129.    The traumatic experiences that Rees endured at the Boys' School caused significant emotional distress and worsening of his mental health disabilities.

130.    Rees' experiences at the Boys' School eradicated his ability to become a functioning member of society.

### b. Plaintiff Blaise Chivers-King

131.    Plaintiff Blaise Chivers-King resided at the Boys' School twice, from approximately April 2020 until March 2021 and again from May 2021 until May 2022.

132.    Blaise has been diagnosed with a variety of mental health and emotional disabilities including PTSD, severe anxiety, depression, and explosive anger. He has taken medication for his mental health since he was diagnosed. Blaise has also been diagnosed with learning disabilities.

133.    Blaise's mental health disabilities substantially limit one or more major life activities, including but not limited to mentally processing current events, thinking, learning, concentrating, comprehending, interacting with others, sleeping, and effectively coping with anxiety and stress.

134.    Blaise's disabilities were recorded, and he was regarded as having such impairment by the Boys' School and its staff, as well as Wyoming DFS and its staff.

135.    To accommodate his disabilities, Blaise had an Individualized Education Plan ("IEP") that required one-on-one instruction with a teacher specialized in special education.

136.    While at the Boys' School, staff subjected Blaise to solitary confinement, physical abuse, emotional and psychological abuse, and mismanagement of his medications. Staff also discriminated against Blaise because he has disabilities.

137.    Boys' School staff, including Defendant Mike Nelson, arbitrarily classified Blaise as a dangerous kid due to his size and the symptoms of his mental health.

138.    Staff—including Mike Nelson, Thad Shaffer, Amanda Turner, and Mark Knaus—intentionally provoked Blaise in ways that they knew would manifest symptoms of his disabilities, giving the staff an excuse to restrain him and place him in solitary confinement.

139.    Mike Nelson, Thad Shaffer, and Mark Knaus regularly mocked and intentionally embarrassed Blaise in front of his peers.

140.    The staffs' intentional acts to humiliate Blaise caused him to respond with anger and shouting at the staff as the humiliation exacerbated the challenges that he faces with mental health and caused Blaise to shout profanity at the staff members.

141.    On his eighteenth birthday, the staff intentionally provoked Blaise so that they could call the sheriff to send him to the adult jail. When the sheriff's department reviewed the surveillance of the incident, it became apparent to the sheriff deputy that Defendant Thad Shaffer, Aaron Tadlock, and other staff members antagonized Blaise and threw him against the wall.

142.    The Boys' School staff placed Blaise in solitary confinement on approximately twenty (20) different occasions, ranging from one day to two weeks at a time.

143.    Defendant Mike Nelson subjected Blaise to solitary confinement while he was housed in Dorms 1 and 4, and Defendant Weber approved of Blaise's punishment in solitary confinement.

144.    Defendant Weber also isolated Blaise in Dorm 2, wherein Blaise was isolated alone in a cell in the empty dorm.

145.    While isolated in Dorm 2, Defendant Weber was directly responsible for Blaise's care and treatment.

146.    Blaise exhibited symptoms that directly correlate with his placement in solitary confinement, including feeling stressed, anxious, angry, and hopeless.

147.    The Boys' School never made any effort to determine whether Blaise's behavior was a manifestation of or otherwise related to his mental health disabilities.

148.    Being held in solitary worsened Blaise's mental health disabilities.

149.    While in solitary confinement, Blaise was only allowed out of the detention room for four to eight minutes a day to take a shower. This time was the only time Blaise was allowed out of his cell during his periods of solitary confinement.

150.    Blaise was not permitted to call his mother or his lawyer while in solitary confinement.

151.    Boys' School staff—including Defendants Thad Shaffer, Mike Nelson, and Mark Nelson—subjected Blaise to improper restraints while he was in solitary confinement, and inflicted serious physical abuse on him, including slamming his body, holding his head against a wall, and throwing him to the floor.

152.    Defendant Thad Shaffer caused Blaise significant pain when he physically restrained his arms behind his head improperly. On at least one occasion, Defendant Shaffer threw Blaise against the wall then forcefully shoved Blaise's head onto the hardwood floor, where he held him down with his arm. While Blaise was restrained on the ground, Shaffer held Blaise's arms behind his head, causing him excruciating pain.

153.    Blaise suffered bruising on his head, scratches, and headaches as a result of the staffs' use of force.

154.    Mark Nelson also caused Blaise's hands to go purple because he administered restraints improperly.

155.    When Blaise complained of injuries from the staffs' improper restraints and force, Defendants Mike Nelson, Mark Nelson, and Thad Shaffer laughed at him.

156.    Staff physically abused Blaise in other ways as well. For instance, on December 10, 2021, the Boys' School staff Aaron Tadlock attempted to tackle Blaise after Blaise flipped a

desk. In Tadlock's attempt to tackle Blaise, he sent him into the wall. As the incident unfolded, eight adult staff members simultaneously held down and restrained Blaise.

157.    The Boys' School staff medically abused and neglected Blaise as well.

158.    The Boys' School head nurse, Defendant Margaret Dahlke, prescribed Blaise an illegal limit of a new medication. A doctor he visited after his release explained that Blaise would need to work with his doctor to help his brain adjust from the effects of that overmedication.

159.    Nurse Dahlke also abruptly stopped other medications rather than weaning Blaise off them.

160.    When Blaise's mother recognized that Blaise was having a very difficult time at the Boys' School, she asked whether he was taking his medications as prescribed. Nurse Dahlke told Blaise's mother that "Blaise is in state custody, you don't have control over what medications he takes."

161.    Blaise became so distraught during his time at the Boys' School that he would hit his head against the brick walls, and he ripped out the metal braces on his teeth and used them to cut himself.

162.    Blaise regularly contemplated committing suicide.

163.    On at least one occasion, Blaise attempted to take his life by creating a noose with ripped up clothing. Blaise was unsuccessful, and Defendant Mike Nelson mocked him because "he did not succeed."

164.    The Boys' School staff also failed to provide Blaise with a meaningful education, given his disabilities. Although Blaise had an IEP that required one-on-one instruction with a teacher specialized in special education, the Boys' School failed to comply with Blaise's IEP, and placed him in a classroom with the other residents.

165.    Defendants subjected Blaise to a substantial risk of serious harm by isolating him in confinement, including by causing him to engage in serious self-injury, placing him at risk for suicide, exacerbating his psychiatric disability, and causing him to experience further trauma. By isolating him in solitary confinement, Defendants also subjected Blaise to disability discrimination by failing to modify their policies and procedures to accommodate his disability; by denying him equal access to programs, services, and activities, including recreation, education, and healthcare because of his disability; and by failing to house him in the most integrated setting to meet his needs.

166.    During his various periods of solitary confinement, Blaise did not have meaningful access to or ability to participate in any therapeutic programming or education classes. As a result, he has not graduated from high school or earned his GED because he cannot pass the test.

167.    During his various periods of solitary confinement, Blaise did not receive mental health services.

168.    At no point during his time at the Boys' School did Blaise receive any notice, hearing, or any form of due process prior to placement in solitary confinement.

169.    The traumatic experiences that Blaise endured at the Boys' School caused significant emotional distress and worsening of his mental health disabilities.

170.    Blaise's experiences at the Boys' School eradicated his ability to become a functioning member of society.

### c. Dylan Tolar

171.    Dylan Tolar was transferred to the Boys' School from a different facility on June 22, 2020, when he was seventeen years old.

172.   When he was six months old, Dylan was diagnosed with a rare birth defect known as Schizencephaly, which causes physical impairments to the right side of his body. Manifestations of his disorder include cerebral palsy and a range of other neurocognitive disabilities.

173.   He has undergone surgeries to ameliorate the harms of this birth defect. However, his physical disabilities have required him to wear a leg brace since he was two years old.

174.   Dylan was also diagnosed with a hole in a portion of his brain.

175.   In addition to his physical and neurological disabilities, Dylan has a number of mental health diagnoses and disabilities, including bipolar disorder, ADHD, epilepsy, executive function disorder, and autism spectrum disorder.

176.   Dylan's diagnosed disabilities substantially limits one or more major life activities, including but not limited to walking, caring for himself, working, mentally processing current events, thinking, learning, concentrating, comprehending, interacting with others, sleeping, and effectively coping with anxiety and stress.

177.   Dylan also had a record of such impairments and was regarded as having such impairment by the Boys' School and its staff, as well as Wyoming DFS and its staff.

178.   Due to his extensive needs, Dylan's mother was extremely concerned when he was court-ordered to the Boys' School for an indefinite period. When Dylan's mother dropped him off at the facility, Elsa Olson, Amanda Turner, and a male security guard met Dylan and his mother in the parking lot and immediately shackled his wrists and ankles over his mother's protests.

179.   Dylan's mother explained that it was dangerous to shackle Dylan because of his physical and mental health conditions, but Defendants Elsa Olson and Amanda Turner claimed that they needed to shackle Dylan for their own protection.

180.    When Dylan arrived at the Boys' School, he was assigned to Dorm 4 where Defendant Elsa Olson was the dorm director.

181.    On Dylan's first night at the Boys' School, he woke up to use the bathroom but did not understand how to use the metal toilet that was in his room. When he attempted to ask for help from the staff, they told him he had a handbook and to figure it out himself. When Dylan was still not able to figure out how to use the toilet in his room, he again asked for help but was told by staff to "shut the fuck up and go back to sleep."

182.    Defendant Amanda Turner and other staff threatened to restrain him if he asked for help again.

183.    Unable to figure out how to operate the metal toilet in his room, Dylan was forced to soil his pants.

184.    The next day, Defendant Elsa Olson called Dylan's mother and asked if he needed diapers because he was "shitting himself." Dylan's mother was shocked because Dylan had not previously had this problem and did not require diapers.

185.    For solely punitive measures after the soiling incident, staff designated Dylan a flight risk and revoked several of his privileges, even though he was physically incapable of running away due to his physical impairment. Staff also prohibited Dylan from attending therapeutic programming at the Boys' School. In fact, Dylan only participated in one sexual behavior program, despite being sent to the Boys' School to receive this programming.

186.    Throughout the five-month period Dylan was housed in Dorm 4, Defendants Olson, Schwalbe, and Weber isolated Dylan in his room almost the entire time except for one week and four days.

187.    Dylan's room had cinderblock walls, a twin-size mattress on the ground, a metal door, and a single window. This room, which was different than the room he was in on his first night, did not have a toilet or sink in it.

188.    Dylan was only allowed out of his room to use the restroom or shower, which was heavily regulated. Staff routinely made Dylan hold his bladder and bowels by making him wait long periods of time before they would let him out of his cell to use the restroom.

189.    At one point, the staff's refusal to let Dylan use the restroom while he was locked in solitary confinement caused him to have a bladder infection.

190.    When Dylan was let out of his room to shower, he was only given seven minutes to shower and get dressed, which was not enough time given his physical disabilities. As a result, Dylan had to decide whether to wash his hair or his body.

191.    Dylan was not allowed to converse with other boys in his dorm.

192.    To cope with the isolation from this prolonged solitary confinement, Dylan would talk to himself or play different characters.

193.    Dylan's neighbor, who was also in solitary confinement, began hitting the concrete walls and screaming. While his neighbor hit the walls and screamed, Dylan stayed quiet in his room and tried to ignore the situation. Defendant John Schwalbe told Dylan's neighbor to "shut the fuck up or I'll make you." When Dylan's neighbor did not stop, Defendant Schwalbe slammed the minor to the ground and put him in mechanical restraints that resembled a strait jacket.

194.    Around this time, the stress and impacts of solitary confinement and his treatment by the Boys' School's staff caused Dylan to begin having grand mal seizures.

195.    Dylan had not had seizures for approximately twelve years before his stay at the Boys' School.

196.     Defendants Olson and Schwalbe were particularly cruel to Dylan.

197.     Defendant Schwalbe made fun of Dylan's disabilities, calling him a "slow zombie" and a "clown," and mocking him, stating, "I'm [Dylan] and I can only walk and talk slow," while dragging his feet in an attempt to mimic Dylan's physical disability. Further, because of Dylan's disabilities, he can only lift one side of his face when he smiles. Defendant Schwalbe would cruelly scold Dylan, stating, "stop smiling, you look like a fucking clown."

198.     In November 2020—at the height of the COVID-19 pandemic—Defendant Schwalbe became angry at Dylan for being "too slow" and spit in his face. Shortly thereafter, Dylan contracted COVID-19, and staff then blamed Dylan for spreading it to other children.

199.     Defendant Olson emotionally and psychologically manipulated and abused Dylan and his family. She would tell Dylan's mother that Dylan did not like her anymore, and she would separately tell Dylan that his mother did not love him anymore and that he would have nowhere to go once he was released from the Boys' School.

200.     Defendants Olson and Schwalbe told Dylan that he was "fucking pathetic" and that he would always be a "child molester." They also told him his mother could never love him and intercepted letters that his mother sent him, including a letter she sent to him on his birthday.

201.     Defendant Schwalbe refused to accept Dylan's ADHD diagnosis, claiming that it was not a real diagnosis and was just an excuse. On one occasion, Dylan looked up from his computer as his counselor, Ms. Galovich, walked by him. Defendant Schwalbe immediately pulled Dylan into a corner and scolded him for looking at Ms. Galovich. Defendant Schwalbe was adamant that Dylan had sexual fantasies about Ms. Galovich, which Dylan repeatedly denied. However, Defendant Schwalbe would not let Dylan go unless he confessed to having sexual fantasies about Ms. Galovich in a written confession.

202.    Defendant Olson also refused to accept that Dylan had anything wrong with his brain, despite not being a medical professional and other medical professionals and brain scans objectively showing that Dylan has a hole in the grey matter of his brain.

203.    Defendants Olson, Schwalbe, and Weber also denied Dylan necessary medical care for his disabilities.

204.    For example, as noted above, Dylan is required to wear a leg brace for his physical disability. However, Defendant Olson regularly withheld his doctor-ordered leg brace throughout the time he was in dorm 4 as a form of punishment.

205.    Defendant Weber was aware that Dylan required a leg brace and Elsa Olson was withholding Dylan's leg brace but failed to do anything about it.

206.    On one occasion, the rivet in Dylan's leg brace popped off, Defendant Olson confiscated the leg brace, claiming that it was a weapon.

207.    When the maintenance person eventually fixed the leg brace, Olson refused to return the brace to Dylan, claiming that he owed the maintenance man for fixing it.

208.    Olson refused to return Dylan's leg brace to him for approximately six months. As a result, he could not participate in any physical activities and could only do upper body exercises sitting in a chair.

209.    Because staff cruelly denied Dylan his leg brace, his leg became bowed, and his foot became mangled. He also had a sore on his left ankle and a callus on his right foot from dragging his foot due to not wearing the brace. Dylan's leg continued to degrade, and he now needs reconstructive surgery on his leg.

210.    As of the date of this Complaint, Dylan's kneecap regularly pops out of place, causing him significant pain and requires EMS to come to his house for assistance.

211.    Beyond his leg brace, the Boys' School staff also denied Dylan necessary Botox injections in his legs to treat his spasms and leg pain. Eventually, after increasing insistence from his mother, staff permitted Dylan's mother to take him to his doctor in Salt Lake City to receive the injections. But they made Dylan transfer and spend the night in the Rock Springs adult prison before releasing him to his mother.

212.    Dylan was surprised to see his mother because staff had intercepted her letters to Dylan, so Dylan was not aware she was picking him up. Indeed, Dylan had come to believe that his mother had forgotten about him or no longer loved him. During this drive to Salt Lake City, Dylan broke down crying and disclosed to his mother the abuses he had been experiencing at the Boys' School.

213.    Dylan's mother then called Dylan's caseworker at DFS, Dan Mast, and demanded that Child Protective Services ("CPS," a division within DFS) investigate the abuses her son was suffering at the Boy's School.

214.    Mr. Mast initially refused to believe Dylan's credible allegations of abuse and responded that Dylan had a history of not telling the truth. Ultimately, Dylan was transferred to a different dorm, and CPS conducted an "investigation," which only appeared to involve them interviewing Dylan.

215.    None of the Boys' School staff were disciplined for their treatment of Dylan.

216.    The Boys' School deprived Dylan of a meaningful education, claiming that he had lost that "privilege."

217.    The Boys' School prohibited Dylan from going to school with the other residents and did not provide him with education services in his cell.

218.    Defendants subjected Dylan to a substantial risk of serious harm by isolating him in confinement, including by causing him to engage in serious self-injury, placing him at risk for suicide, exacerbating his psychiatric disability, and causing him to experience further trauma. By isolating him in solitary confinement, Defendants also subject Dylan to disability discrimination by failing to modify their policies and procedures to accommodate his disability; by denying him equal access to programs, services, and activities, including recreation, education, and healthcare because of his disability; and by failing to house him in the most integrated setting to meet his needs.

219.    During his various periods of solitary confinement, Dylan did not have meaningful access to or ability to participate in any therapeutic programming or education classes.

220.    During his various periods of solitary confinement, Dylan did not receive mental health services.

221.    At no point during his time at the Boys' School did Dylan receive any notice, hearing, or any form of due process prior to placement in solitary confinement.

222.    The traumatic experiences that Dylan endured at the Boys' School caused significant emotional distress and worsening of his mental health disabilities.

223.    Dylan's experiences at the Boys' School eradicated his ability to become a functioning member of society.

224.    Since leaving the Boys' School, Dylan has continued to experience seizures if he misses his medication. He had not needed medication for seizures for several years prior to his time at the Boys' School. Today, Dylan sleeps with his mattress on the floor, because he is fearful of what will happen if he has a seizure while sleeping.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
**Isolation Resulting in Deprivation of Basic Human Needs – Violation of Plaintiffs' Eighth & Fourteenth Amendment Rights**
(Against Defendants Weber, Adams, Olson, Amanda Turner, and Mike Nelson)

225.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

226.    Defendants Weber, Adams, Olson, Turner, and Mike Nelson are persons under 42 U.S.C. § 1983, who at all times relevant to this claim, were acting under color of state law in their actions and inactions.

227.    At all relevant times, Defendants Adams, Olson, Turner, and Mike Nelson were dormitory directors responsible for determining appropriate consequences for minors housed in their dorms and subjected Plaintiffs to prolonged solitary confinement. Specifically, Defendant Adams subjected Rees to solitary confinement in Dorm 3; Defendant Olson subjected Rees and Dylan to solitary confinement in Dorm 4; Defendant Turner subjected Dylan to solitary confinement; and Mike Nelson subjected Blaise to solitary confinement in Dorm 1. Upon information and belief, other dormitory staff also personally participated in subjecting Plaintiffs to prolonged solitary confinement.

228.    At all relevant times, Defendant Weber was the Duty Superintendent and responsible for approving minors' placement in solitary confinement. Defendant Weber's responsibilities as the Duty Superintendent included, "[m]aking provisions that ensure the safety, security and well-being of residents and staff involved in the situation; and "[e]nsuring the resident's physical, mental health, and safety needs can reasonably be met by [the Boys' School]." Defendant Weber personally participated in approving Plaintiffs' prolonged solitary confinement within their respective dorms and was directly responsible for Rees and Dylan's care while they

were in solitary confinement in Dorm 2.

229.    Defendants, by act or omission, deprived Plaintiffs of the minimal civilized measure of life's necessities and have violated their basic human dignity and their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

230.    Defendants have a policy, practice, or custom of routinely using solitary confinement on minors at the Boys' School without lawful purpose. As described above, Defendants' practice of solitary confinement subjected Plaintiffs to, among other harmful conditions: 23-24 hours per day in a cell—for days, weeks, or months at a time; lack of access to educational programming; lack of access to programs and services related to their learning or mental health disabilities; and lack of access to meaningful exercise and social interaction. Defendants' practices and policies created a substantial risk of serious emotional, psychological, and physical harm to Plaintiffs.

231.    The cumulative effect of solitary confinement, particularly on children with disabilities, constitutes a serious deprivation of basic human needs, including but not limited to human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity. Solitary confinement also strips human beings, particularly children with disabilities, of their basic dignity and humanity in violation of contemporary standards of human decency and constitutes cruel and unusual treatment prohibited by the Eighth and Fourteenth Amendments.

232.    Defendants were aware of the extreme conditions of isolation, as well as the substantial risk of harm to a person's mental and physical health that is attendant to conditions of confinement.

233.    Defendants were aware that the risk of harm to a person's mental and physical health while in isolation are more acute for people like Plaintiffs who are children with disabilities.

234.    That the Boys' Schools policies and practices violated contemporary standards of human dignity and decency is evidenced by the fact those practices are unusual in comparison to other states' practices with respect to the treatment of minors in juvenile justice settings. Other states prohibit the use of solitary confinement for minors. Additionally, several other states prohibit the use of solitary confinement for *any person* with mental disabilities, regardless of their age. Further, the internal community condemns the practice of solitary confinement under the conditions that exist at the Boys' School.

235.    Defendants acted with deliberate indifference in that they knew or should have known that solitary confinement posed a high risk of harm to Plaintiffs, and in fact did harm Plaintiffs. Yet, Defendants failed to take reasonable steps to prevent such harm. Moreover, Defendants are aware of the substantial risk of serious harm that these youth will suffer as a result of these practices and policies. Defendants' actions and inaction are in deliberate indifference to serious, known health and safety needs of Plaintiffs.

236.    Defendants' actions and inaction shock the conscience and are in deliberate indifference to serious, known health and safety needs of residents, and create substantial risks of serious harms in violation of Plaintiffs' rights under the Fourteenth Amendment.

237.    The acts and omissions of Defendants Weber, Adams, Olson, Turner, and Mike Nelson were the legal and proximate cause of Plaintiffs' injuries.

238.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, prejudgment interest, and costs as allowable by federal law.

239.    Plaintiffs are entitled to punitive damages against these Defendants, in that their

actions were taken maliciously, willfully, or with reckless or wanton disregard of the constitutional rights of Plaintiffs.

## SECOND CLAIM FOR RELIEF

### Violation of 42 U.S.C. § 1983 – Fourteenth Amendment
### Unlawful Use of Restraints and Excessive Force

(Against Defendants Weber, Shaffer, Schwalbe, Mike Nelson, and Mark Nelson)

240.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

241.    Defendants Weber, Shaffer, Schwalbe, Mike Nelson, and Mark Nelson are persons under 42 U.S.C. § 1983, who at all times relevant to this claim, were acting under color of state law in their actions and inactions.

242.    Plaintiffs, as minors in the custody of the state, had a clearly established right under the Fourteenth Amendment of the United States Constitution to be secure in their persons against the deprivations of life, liberty, or property without due process of law, including through the use of excessive force.

243.    At all relevant times, Defendants Shaffer, Schwalbe, Mike Nelson, and Mark Nelson personally participated in subjecting Plaintiffs to objectively unreasonable excessive force and unlawful restraints. For example:

   a.  Defendants Weber, Shaffer, Schwalbe, and Mark Nelson each restrained Rees in a restraint chair while he was in solitary confinement in Dorm 2. In the restraint chair, Rees' wrists, ankles, and mid-section were strapped down so that he could not move. Defendants restrained Rees in the chair for approximately twelve hours each day for approximately two weeks.

   b.  Defendant Shaffer forcefully tackled Rees and broke his wrist.

   c.  Defendant Schwalbe forcefully shoved Rees' face into shattered glass while holding him on the ground as punishment for breaking the glass.

   d.  Staff member Tadlock attempted to tackle Blaise and sent him into the wall. As the

incident unfolded, eight adult staff members simultaneously held down and restrained Blaise.

e.  Defendant Shaffer threw Blaise against the wall then forcefully shoved Blaise's head onto the hardwood floor, where he held him down with his arm. While Blaise was restrained on the ground, Shaffer held Blaise's arms behind his head, causing him excruciating pain.

f.  Defendant Mark Nelson caused Blaise's hands to go purple because he administered restraints improperly.

g.  On various occasions, Defendants Shaffer, Mike Nelson, and Mark Nelson subjected Blaise to improper restraints and inflicted serious physical abuse on him, including slamming his body, holding his head against a wall, and throwing him to the floor.

h.  Defendants also improperly restrained Dylan in shackles on various occasions.

244.  Upon information and belief, other Boys' School staff also personally participated in subjecting Plaintiffs to excessive and unlawful restraints.

245.  Defendants Shaffer, Schwalbe, Mike Nelson, and Mark Nelson's uses of force were objectively unreasonable under the circumstances.

246.  Defendant Weber, as the Deputy Superintendent, approved or condoned Defendants Shaffer, Schwalbe, Mike Nelson, and Mark Nelson's unreasonable and excessive uses of force and restraints.

247.  Defendants Weber, Shaffer, Schwalbe, Mike Nelson, and Mark Nelson were either active participants or failed to intervene in the excessive force that was objectively unreasonable under the circumstances.

248.  Excessive use of restraints as a form of punishment imposes serious psychological pain and suffering and physical injuries, which Defendants were aware.

249.  Defendants' excessive use of restraints and force stripped Plaintiffs of their basic dignity and humanity in violation of contemporary standards of human decency.

250.    Defendants were aware of the risks of excessive use of restraints and excessive force but disregarded their knowledge of the risks to Plaintiffs.

251.    Defendants' actions and inaction shock the conscience and are in deliberate indifference to serious, known health and safety needs of residents, and create substantial risks of serious harms in violation of Plaintiffs' rights under the Fourteenth Amendment.

252.    The acts and omissions of Defendants Weber, Shaffer, Schwalbe, Mike Nelson, and Mark Nelson were the legal and proximate cause of Plaintiffs' injuries.

253.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, prejudgment interest, and costs as allowable by federal law.

254.    Plaintiffs are entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully, or with reckless or wanton disregard of the constitutional rights of Plaintiffs.

### THIRD CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1983 – Fourteenth Amendments**
**Deliberate Indifference to Medical Needs**

(Against Defendants Olson, Shaffer, Schwalbe, Mike Nelson, Dahlke, McGenty, and Weber)

255.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

256.    Defendants Olson, Shaffer, Schwalbe, Mike Nelson, Dahlke, and Weber are persons under 42 U.S.C. § 1983, who at all times relevant to this claim, were acting under color of state law in their actions and inactions.

257.    Plaintiffs had a clearly established right under the Fourteenth Amendment to be free from deliberate indifference to their known serious medical needs.

258.    With respect to Plaintiff Dylan Tolar, Defendants  Olson, Schwalbe, and Weber knew of his need to receive Botox injections and need to wear his leg brace and nonetheless, with

deliberate indifference, decided not to allow him to receive injections or wear his leg brace. Defendants' treatment (or lack thereof) was in reckless disregard to a substantial risk of physical harm to Dylan Tolar. Defendants continued to act in bad faith and with deliberate indifference to Dylan Tolar's serious medical needs and constitutional rights when they willfully ignored him and his mother's repeated requests to provide him with his necessary medical care.

259.     With respect to Plaintiff Rees Karn, Defendants Weber, Schwalbe, and Shaffer knew that he needed to receive medical care for his broken wrist and nonetheless, with deliberate indifference, decided not to allow him to be seen by a doctor. Additionally, Defendant McGenty knew that Rees had attempted a suicide by hanging and failed to immediately act to save Rees, knowing that there was a substantial risk of death or harm to Rees. Defendants' McGenty, Weber, Schwalbe, and Shaffer's treatment (or lack thereof) was in reckless disregard to a substantial risk of physical harm to Rees Karn's serious medical needs and constitutional rights when they willfully ignored him and other staff's repeated requests that he be seen by a doctor and suicide attempt.

260.     With respect to Plaintiff Blaise Chivers-King, Defendant Dahlke provided him with an illegal limit of one medication while abruptly stopping other prescribed medications without justification. Defendant Dahlke knew that Blaise required his medication but decided not to provide them to him without justification. Additionally, Defendant Dahlke's treatment (or lack thereof) was in reckless disregard to a substantial risk of harm to Blaise. Defendant Dahlke continued to act in bad faith and with deliberate indifference to Plaintiff's serious medical needs and constitutional rights when she willfully ignored Blaise's mother's repeated requests to provide Blaise medication and intentionally denied Blaise's access to medical care.

261.     Need to add something about [Mike/Mark] Nelson.

262.    The acts or omissions of Defendants as described herein intentionally deprived Plaintiffs of their constitutional rights and were moving forces and substantial significant contributing proximate causes of Plaintiffs' injuries.

263.    As a direct result of Defendants' unlawful conduct, Plaintiffs have suffered injuries, damages and losses as described herein entitling her to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

264.    As a direct result of Defendants' unlawful conduct, Plaintiffs have incurred significant special damages, including medically related expenses and will continue to incur further medically related expenses in amounts to be established at trial.

265.    As a direct result of Defendants' unlawful conduct, Plaintiffs have also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

266.    Plaintiffs are further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

267.    Plaintiffs are entitled to punitive damages under 42 U.S.C. § 1983, in that the actions of Defendants were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs.

**FOURTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – Fourteenth Amendment**
**Due Process**
(Against Defendant Weber)

268.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

269.    Defendant Weber is person within the meaning of 42 U.S.C. § 1983.

270.     At all relevant times, Plaintiffs had a constitutionally protected interest under the Fourteenth Amendment to receive due process.

271.     Defendant Weber deprived Plaintiffs of their liberty interests without due process of law by denying them meaningful and periodic reviews of their detention in solitary confinement and meaningful notice of what they must do to earn release, in violation of the Fourteenth Amendment.

272.     The conditions and duration of Plaintiffs' confinement in isolation and while being held in restraints constitute an atypical and significant hardship compared to the ordinary incidents of the Boys' School due to the exceedingly harsh and isolating conditions Plaintiffs suffered.

273.     Because isolation and use of restraints constitute significant and atypical hardship, plaintiffs were entitled to meaningful notice of how they may alter the behavior to not have such harsh punishments inflicted, as well as meaningful and timely periodic reviews of their isolation and time in restraints.

274.     Defendant Weber denied Plaintiffs such notice or meaningful review by failing to provide them with notice of what they can do to be released from isolation, or providing misleading notice, making predetermined decisions about their stay in isolation.

275.     Wyoming Defendants' failure to train and supervise their employees was a moving force and proximate cause of the violation of Plaintiffs' constitutional rights.

276.     The policies, customs, and practices of Wyoming Defendants as described herein deprived Plaintiffs of their rights, privileges, liberties, and immunities secured by the United States Constitution, and caused Plaintiffs other damages.

277.     As a direct result of Defendants' unlawful conduct, Plaintiffs have suffered injuries, damages and losses as described herein entitling her to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

278.     As a further result of the Defendants' unlawful conduct, Plaintiffs have incurred special damages, including significant medically related expenses and will continue to incur further medically related expenses in amounts to be established at trial.

279.     Plaintiffs also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

280.     Plaintiffs are further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 12132 – Disability Discrimination
### (Against all Defendants)

281.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

282.     The Americans with Disabilities Act (hereinafter referred to as the "ADA"), 42 U.S.C. §§ 12101 *et seq.,* and specifically 42 U.S.C. § 12131-12134, prohibits discrimination in public services on the basis of disability. 42 U.S.C. § 12131 provides:

> Subject the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

283.     The ADA defines a "public entity" to include any state or local government or any department, agency, special purpose district, or other instrumentality of a State or local government, 42 U.S.C. § 12131(1). the Boys' School and Wyoming Department of Family Services are each a "public entity" within the meaning of the ADA.

284.   At all relevant times, Plaintiffs were persons with a disability that substantially limits one or more of their major life activities, had records of their disabilities, or were regarded as having a disability by Defendants.

285.   Defendant were aware of Plaintiffs' disabilities during the time that they were at the Boys' School.

286.    Plaintiffs, with or without reasonable modifications to rules, policies or practices, met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the Defendants. Thus, Plaintiffs were "qualified individual[s] with disabilities" within the meaning of the ADA, 42 U.S.C. § 12131(2).

287.   Plaintiffs were qualified to participate in the services, programs, activities, and benefits provided to boys and detainees at the Boys' School within the meaning of Title II of the ADA.

288.   Individual Defendants targeted and discriminated against Plaintiffs on the basis of their disabilities and failed to reasonably accommodate their disabilities despite knowing that they suffered from a number of mental health disabilities, and that Dylan at least one physical disability.

289.   These actions and inactions violated clearly established law under Title II of the ADA and its implementing regulations.

    a.   While Plaintiffs are locked in solitary confinement, Defendants excluded them from participating in and denied them the benefits of Defendants' educational and rehabilitative programs, service, and activities by reason of their disabilities. Specifically, Plaintiffs were excluded from these programs by reason of their disabilities in that the behaviors that lead to Plaintiffs being put in solitary confinement are a direct result of their disability.

    b.   Solitary confinement has a disproportionate burden on Plaintiffs by reason of their disabilities that results in further solitary confinement and further denial of educational and rehabilitative programs, service, and activities.

    c.   Defendants failed to make reasonable modifications to their policies, practices, and

procedures even though such modifications are necessary to avoid discriminating under the ADA.

290. Defendants adopted and implemented policies and practices with regard to solitary confinement that had a disparate impact on children with disabilities.

291. Defendants failed to provide Plaintiffs with the special education and related services they require, by reason of their disabilities, to equally access education in Wyoming Boys' School.

292. Defendants had no legitimate basis for violating Plaintiffs' rights, and Defendants engaged in these actions and inactions intentionally, willfully, and wantonly.

293. Because Defendants' conduct also constitutes a Fourteenth Amendment violation, Defendants Wyoming Boys' School and Wyoming DFS are not entitled to sovereign immunity.

294. Defendants' actions and inactions were the proximate and legal cause of Plaintiffs' injuries.

295. Defendants Wyoming Boys' School and Wyoming Department of Family Services failed to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities.

296. This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Defendant Weber.

297. Plaintiffs have suffered damages by Defendant's unlawful conduct under the ADA, and are entitled to compensatory damages, including damages for emotional pain, suffering, and mental anguish.

**SIXTH CLAIM FOR RELIEF**
**Section 504 of the Rehabilitation Act - Discrimination**
**(Against all Defendants)**

298.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

299.    Section 504 prohibits any qualified individual with a disability from being excluded from the participation in, denied the benefits of, or to be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

300.    Defendants Wyoming Boys School and Wyoming DFS are public entities receiving federal funds and are therefore subject to Section 504. 29 U.S.C. § 794(a), (b).

301.    Plaintiffs are each qualified individuals with disabilities, as detailed herein.

302.    Plaintiffs' disabilities substantially limit one or more life activities, such as learning, concentrating, thinking, communicating, sleeping, and/or walking.

303.    Wyoming Boys School and Wyoming DFS regarded each Plaintiff as having disabilities.

304.    Plaintiffs were intentionally excluded from participation in and denied the benefits of Wyoming Defendants' services, programs, or activities. Plaintiffs were denied participation in educational programs, therapeutic programs, rehabilitative programs, and other services. The exclusions were based solely on their respective disabilities.

305.    Wyoming Defendants discriminated against Plaintiffs based solely on the basis of their disabilities that drove their disruptive or problematic behaviors and prevented them from participating in programming like all other non-disabled children.

306.    Defendants adopted and implemented policies and practices with regard to solitary confinement that had a disparate impact on children with disabilities.

307.    Defendants failed to provide Plaintiffs with the special education and related

services they require, by reason of their disabilities, to equally access education in Wyoming Boys' School.

308.    Defendants had no legitimate basis for violating Plaintiffs' rights, and Defendants engaged in these actions and inactions intentionally, willfully, and wantonly.

309.    Because Defendants' conduct also constitutes a Fourteenth Amendment violation, Defendants Wyoming Boys' School and Wyoming DFS are not entitled to sovereign immunity.

310.    Defendants' actions and inactions were the proximate and legal cause of Plaintiffs' injuries.

311.    Defendants Wyoming Boys' School and Wyoming Department of Family Services failed to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities.

312.    This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Defendant Weber.

313.    Plaintiffs have suffered damages by Defendants' unlawful conduct under Section 504 and are entitled to compensatory damages, as permitted by law.

<u>**PRAYER FOR RELIEF**</u>

Plaintiffs pray that this Court enter judgment for the Plaintiffs and against each of the Defendants and award the following relief:

1. All appropriate relief at law and equity;

2. Economic losses on all claims as allowed by law;

3.   Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

4.   Punitive damages on all claims allowed by law and in amount to be determined at trial;

5.   Attorney fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

6.   Pre-and post-judgment interest at the appropriate lawful rate;

7.   Declaratory and other appropriate equitable relief; and

8.   Any further relief that this Court deems just and proper, and any other relief as allowed by law and equity.

**PLAINTIFFS RESPECTFULLY REQUEST A JURY TRIAL ON ALL TRIABLE ISSUES.**

DATED: February 26, 2024

RATHOD | MOHAMEDBHAI LLC

ALM LAW LLC

*s/ Qusair Mohamedbhai*
Qusair Mohamedbhai, Bar No. 6-3809
Ciara M. Anderson (*pro hac vice pending*)
Matthew J. Cron(*pro hac vice pending*)
2701 Lawrence St., Suite 100
Denver, CO 80205
(303) 578-4400
qm@rmlawyers.com
ca@rmlawyers.com
mc@rmlawyers.com

*s/ Allison Mahoney*
Allison Mahoney (*pro hac vice pending*)
PO Box 5520
Snowmass Village, CO 81615
(970) 315-5152

allison@almlawllc.com